**UNITED FRUIT CO. v. UNITED STATES.**

No. 1543.

United States District Court
D. Massachusetts.

June 6, 1950.

Josiah K. Adams, Jr., Bingham, Dana & Gould, Charles S. Bolster, all of Boston, Mass., for plaintiff.

George F. Garrity, U. S. Atty., Edward O. Gourdin, Asst. U. S. Atty., Boston, Mass., for defendant.

FORD, District Judge.

United Fruit Company brings this libel against the United States to recover damages for the failure of the United States to pay for certain items of repairs made to the S. S. Esparta as part of the reconditioning of the vessel prior to its redelivery from a charter party.

The Esparta was built in 1945 for the United Mail Steamship Company and delivered to libellant under demise charter for a ten year period. On the same day, it was delivered by libellant as owner *pro hac vice* to the United States, acting through the War Shipping Administration, pursuant to telegraphic requisition, and a charter party, contract No. WSA-10907, was subsequently executed. Under this contract, respondent undertook to put the vessel at redelivery in at least as good condition and class as it was upon delivery, ordinary wear and tear excepted, or to make payments in lieu of such work.

When the vessel was scheduled for redelivery in June of 1946, libellant prepared specifications of items of repair which it considered necessary and for which it claimed respondent was responsible under the charter party. This work was performed by a shipbuilder and thereafter The Esparta was redelivered to libellant at Mobile, Alabama, on July 23, 1946. However, the representatives of the War Shipping Administration at Mobile declined to accept certain items of the work as coming within the obligations of the United States under the charter party. These items were done by the shipbuilder for the owner's account, and respondent has refused to pay for them. This action is brought to recover the cost of these disputed items.

On August 8, 1946, after the redelivery of the vessel, a Clean Form Redelivery Certificate was executed by W. G. Yung, Operations Supervisor at New Orleans, for the War Shipping Administration, and MacGregor Bullock, then Manager of Steamship and Domestic Pier Operations in New Orleans for the United Fruit Company. The second paragraph of this receipt was as follows: "It is further agreed that the execution of this certificate shall operate as a release by United Fruit Company Chartered Owners, of all claims of whatsoever kind or nature which it now has or may have against the Charterer arising out of Charterer's obligations under the Charter or any amendments thereof or any indemnity agreements made in connection therewith or insurance issued pursuant thereto to perform removals, restoration, repairs or work with respect to the vessel excluding, (a) claims for hire payable or loss of time involved during or until completion of any such removals, restoration, repairs or work, and (b) the adjustment of inventories.

The validity of this release is the sole question before the court at this time. Respondent contends it is valid, and is a complete defense to the claims asserted in the present libel. Libellant's position is that the release constitutes no defense because (1) it was not intended by the parties to operate as a release, (2) it was given without consideration, and (3) it is voidable because executed under a mutual mistake of fact.

Libellant contends that the Clean Form Redelivery Certificate, even though it contains language indicating it is a release of the ship owner's claims against the United States, was intended to be merely a memorandum of the actual physical redelivery of the vessel. The evidence does not support this view. Bullock who signed for libellant read and understood the document he was signing. He knew he was signing a release of claims and intended to do so, even though he may have done so under a misapprehension as to the existence of outstanding unsettled claims. Bullock deposition p. 7. Libellant relies on the testimony of Captain Scott, Chief of the Division of the Redelivery of Chartered Vessels. But Scott's testimony makes it clear that, while he may not have been

fully aware of the exact legal effect of a clean form redelivery receipt, he did know it was more than a mere acknowledgement of receipt of a vessel and would constitute some sort of legal bar to further claims by the owner. Scott deposition p. 46. It was the policy of his division to try to secure the execution of these clean form receipts with the intention of thus effecting a final settlement of the case. Scott deposition pp. 44 and 51. It must be found that the parties executed the release in the case with the understanding and intent that it should operate as an effective and binding release in accordance with its terms. Cf. Williston, Contracts, § 94.

■ Libellant further contends that the release was given without consideration, and hence does not constitute a binding contract. Adequate consideration to support the release can, however, be found in the performance by the United States of certain repairs to the vessel before redelivery. It is true that no particular act done by the United States was specifically designated by the parties as constituting the consideration for this release. The giving of this release was not, however, a single dissociated act performed *in vacuo*. It was an incident of the larger transaction of termination of the existing charter party arrangement and redelivery of The Esparta. In such a situation it is not necessary that the performances or promises of one side be allotted one by one as considerations for each of the separate promises or performances of the other side. Indeed, one consideration may serve to support any number of promises given in return for it. Williston, Contracts, § 137A; Restatement of Contracts, § 83.

■ It is argued, however, by libellant that the repairs performed by the United States cannot constitute legally sufficient consideration because the United States in making these repairs was only doing what it was legally bound to do under the terms of the charter party. Clearly the United States was under a duty to perform such repairs as were necessary to restore the vessel to the same condition it was in when it was first taken. But there had been no determination as to the specific repairs which had to be made to fulfill this obligation. Its duty as to any particular item of repair claimed in libellant's specifications was doubtful—a matter of at least potential disagreement. In such circumstances the acceptance and performance of some of those items is sufficient consideration to support a release covering all the claims involved. Cf. Restatement of Contracts, § 76.

■ Libellant's final contention is that the release was given under mutual mistake as to a material fact, and is therefore voidable at the option of libellant as the party injured. Undoubtedly the release was executed by Bullock in the mistaken belief that his company no longer had any outstanding unsettled claim against the United States. Mistake on his part alone is not enough to invalidate the release, for there is no contention that the mistake was induced by fraud or misrepresentation on the part of the United States or its agents, or even that the United States or its agents knew that Bullock was acting under a misapprehension of the facts. The mistake must be mutual. However, there was no mistake on the part of the United States. Libellant relies on the state of mind of Yung who signed the redelivery certificate on behalf of the United States and who forwarded it to Bullock for his signature. Yung, as he testified, had no knowledge about the claims of United Fruit Company against the United States. Mistake means a state of mind that is not in accord with the facts. *Restatement of Contracts*, § 500. Yung's mental state was not that of mistake as to the existing facts, but rather a state of complete ignorance as to what the facts were. Moreover, it does not appear that if Yung had known that there had been no final agreement as to which items of repair were the liability of the government, this would have influenced his action. From his testimony it appears that he regarded his duty to be to carry out the orders received from Washington, namely, to obtain, if possible, the execution of a clean form redelivery certificate and that the only other course he would have

taken, recourse to his superiors in Washington for further instructions, would have been followed only if the owner had either refused to accept redelivery of the ship, or had refused to execute the release presented to it. Yung deposition pp. 15, 16. There is in fact no evidence of a mistake by anyone acting on behalf of the government in this transaction. They merely followed what was the routine policy of the War Shipping Administration of presenting a clean form certificate to an owner who had outstanding claims against the United States, with the hope that the owner would sign the release and thereby abandon its claims, but with the expectation that if the owner seriously intended to press its claims it would protect its rights by refusing to execute a certificate embodying a release. The action of the agents of the United States was motivated by the hope of securing an abandonment of libellant's claims and not by a mistaken belief that they had already been settled or relinquished. Any belief on the part of the United States or its agents that the libellant was abandoning its claim was the result of the libellant's execution of the release. The release was not induced by mutual mistake and hence it must be held to be valid.

Libel dismissed.